**United States District Court**
For the Northern District of California

1
2
3          UNITED STATES DISTRICT COURT
4          NORTHERN DISTRICT OF CALIFORNIA
5          OAKLAND DIVISION
6

7   MARCELLA LUNSFORD,                          No. 08-5038 PJH (PR)

8              Petitioner,                       **ORDER DENYING PETITION
                                                 FOR WRIT OF HABEAS
9      vs.                                       CORPUS AND GRANTING
                                                 CERTIFICATE OF
10  TINA HORNBEAK, Warden,                       APPEALABILITY**

11             Respondent.
                                    /
12

13         This is a habeas corpus case filed pro se by a state prisoner pursuant to 28 U.S.C. §

14  2254.[1]  The court ordered respondent to show cause why the writ should not be granted.

15  Respondent filed an answer and lodged exhibits with the court.  Petitioner responded with a

16  traverse.  For the reasons set out below, the petition is denied.

17                                    **BACKGROUND[2]**

18         Petitioner was sentenced to 26 years to life without the possibility of parole after a

19  jury convicted her of first degree murder and conspiracy to commit murder, and found true

20  armed allegations and the special circumstances of witness killing and lying in wait.  *People*

21  *v. Lunsford*, No. A115026, 2008 WL 1891421 (Cal. Ct. App., April 29, 2008).  The California

22  Court of Appeal vacated the special circumstance witness killing finding, but otherwise

23  affirmed the judgment and sentence.  *Id.* at 14-16.  The California Supreme Court denied

24  the petition for review and a later habeas petition.  Answer, Ex. E; Docket No. 24.

25

26

27         [1] This case was consolidated with No. 10-0136 PJH (PR).

28         [2] This case has a complicated procedural history that was set forth in a prior court order.
    See Docket No. 24.

**United States District Court**
For the Northern District of California

1

The facts, as described by the California Court of Appeal, are as follows:

2
3

Appellant's son-in-law Nathan was shot and killed by her husband Douglas FN2 on August 6, 2002. The killing followed an earlier attempt by Douglas on Nathan's life, and was prompted by animosity arising from an ongoing child custody dispute between Nathan and appellant's daughter Chasity.

4
5

> FN2. Many of the individuals involved in this case share the same surnames. We refer to them by their first names, not out of disrespect, but to avoid confusion.

6
7
8
9
10
11

The District Attorney of Humboldt County filed an information bringing charges of murder with special circumstances and conspiracy against appellant, Douglas, and her adult son Charles Lunsford. The prosecution's theory was that Douglas had committed the murder, that appellant had aided and abetted him by encouraging him to do so and by securing the murder weapon for him, and that Charles had helped plan the killing and had provided the vehicle used to drive to and flee the murder scene. Douglas and appellant were convicted of murder and related charges and enhancements in separate trials, after which Charles pled guilty to voluntary manslaughter. Appellant's conviction is the only one at issue in this appeal.

12
13
14
15

Prosecution Evidence
Appellant married Douglas in Arkansas in 1979, when she had three children and was pregnant with a fourth. The family moved to Humboldt County, where Douglas's mother and several of his brothers and sisters lived. Between 1980 and 1997, Douglas and appellant moved back and forth between California and Arkansas/Missouri a number of times. Appellant bought a house in Hawkins Bar in Trinity County, using money that Douglas received as a disability payment.

16
17
18
19
20

Appellant's three surviving children are Charles, who was charged as a co-defendant, Chasity and J. Appellant has also adopted J.'s daughter A., who was born when J. was a teenager. In 1995, appellant called the police to report that she had seen Douglas molesting A. During the preliminary hearing in that case, appellant testified that she was the dominant one in the relationship and that Douglas usually did not argue with her. Douglas was convicted of a misdemeanor as a result of those proceedings. The couple divorced, but they remarried in 1997.

21
22
23

Chasity married Nathan, the victim in this case, in 1999. She was then pregnant with her son R., who was not Nathan's biological child. Chasity and Nathan then had their own child in 2000, a girl named M. Appellant was very close to R.

24
25
26
27

Nathan and Chasity began having marital problems in 2001, and Chasity took the children to Missouri. Nathan's father Richard went to appellant's and Douglas's home to find out where the children were. Douglas answered the door and told Richard, "We want [R.], He's not yours. And we'll get blood tests ... to prove it." After Chasity was ordered by the family law court to return from Missouri with the children, Nathan and Chasity decided to reconcile and the divorce proceedings were dismissed.

28

In July 2001, Chasity filed for divorce and obtained a temporary restraining order granting her full custody of her children. She alleged that Nathan had

been violent toward her and was rough with the children. After Nathan filed papers rebutting these allegations, rumors that he had molested the children arose in the case, though Chasity did not include these allegations in her court papers filed under penalty of perjury.

Appellant's son Charles Lunsford (who is developmentally disabled) was married to Trina Lunsford, and they lived in the same house as Douglas from March through June 2001. During that time, Trina heard Charles say that he wanted Nathan killed because "he was going to take the kids." Trina also heard appellant tell Douglas that she wanted Nathan killed, but Douglas told her "it wasn't the right time." Sometime in June 2001, Charles gave Douglas a rifle and they said they were going to "get Nathan." They returned later, telling Trina that Nathan hadn't been home. Trina moved out of the home and into a women's shelter on June 14, 2001, after Charles assaulted her.

Lisa White became Charles's girlfriend in the summer of 2001, when they both lived at the Gambi Hill trailer park. Charles and Lisa sometimes stayed with appellant at the Hawkins Bar house, along with Douglas, Chasity, R., M. and A. R. and A. usually slept with appellant in the master bedroom. On the first night that Lisa stayed at Hawkins Bar, appellant told her that Nathan was trying to take Chasity's children. A few nights later, appellant mentioned that Nathan was not a very nice person, and, recalling the many times he had been "up on the hill," said she "would have just kind of pushed him off." Appellant spoke to Lisa about Nathan almost every day, saying she wished there were a way to get rid of him because it was "not right for a man to molest his son." Appellant was angry about the situation and often told Charles they needed to find someone to get rid of Nathan. Charles would agree with her.

Lisa and Charles moved back to the trailer park, where Charles started talking about Nathan all the time, sometimes saying he would kill or stab him. When they visited appellant, appellant spoke about Nathan quite often, saying she hated him and wanted to see him "destroyed, dead, hurt." Appellant showed Lisa a rifle she kept hidden in a closet. She asked Lisa if there was any way of to get rid of Nathan, and Lisa said she would look around, hoping appellant would "forget about it." Lisa realized appellant was serious when she gave her a picture of Nathan and said she needed him dead. Appellant told Lisa that Nathan left for work at about 4:00 a.m. and returned at 2:00 p.m., and that she wanted Lisa to find someone to kill him.

Nathan and Chasity reached an agreement in the family law case that Nathan could visit the children and that Chasity would never leave them alone with Douglas or Charles. This agreement was memorialized in a negotiated disposition, a written version of which was filed with the court on October 2, 2001. The day after the visitation agreement was filed in court, Nathan noticed Douglas's old white truck parked across the street from his apartment as he was leaving for work at about 5:00 a.m. The person in the truck fired two shots through the back window of Nathan's car. Douglas was charged with the attempted murder of Nathan and taken into custody.

Shortly after Thanksgiving, Charles and Lisa White moved with her three children into appellant's house at Hawkins Bar while appellant was living with Chasity in Chasity's apartment. Appellant told them that Lisa could live in the house for free for as long as she liked if she found someone to kill Nathan. Appellant mentioned during a telephone conversation with Lisa that she loved

her grandchildren too much and asked her, "Are you sure you can get rid of him?"  Charles also asked her to find someone to kill Nathan and said he wanted it done now.  Lisa's sons, Jeremy and Michael, both recalled Charles saying that Nathan should not have custody of the children because he was sexually abusing them.  Jeremy had heard appellant say that Nathan was a bad person who had sexually abused his children.  FN3

> FN3.  Jeremy testified at Douglas's trial for murder that he heard appellant say she wanted Nathan killed, but his testimony at appellant's trial varied as to whether he remembered such death threats by appellant.

Charles spoke to appellant on the telephone on December 14, 2001 and after hanging up, he told Lisa, "Momma's upset.  If you don't find somebody, they go to court Monday, and she said to hurry up.  Get it done."  Later that day, Charles fought with Lisa's son, and Lisa called the police.  Charles was taken into custody and appellant arrived the next day to evict Lisa from the home.

Appellant began dating Donald Manion around Valentine's Day 2002, while Douglas was still in custody awaiting trial in the attempted murder case.  She did not immediately tell Manion that she was married, but later told him that Douglas was in custody on attempted murder charges and that she planned to divorce him.  Manion showed appellant his rifle collection, which included a 30.30 Winchester model that he kept on the wall of his bedroom.  Appellant shot the rifle during target practice, and at one point told Manion that if he killed Nathan, she would run away with him.  Appellant sometimes spent the night with Manion, but would bring her grandchildren along. She seemed to hate Nathan and talked about him often during her dates with Manion.

During a conversation with Douglas's brother Jonathan Lunsford, appellant explained that she was "too young a woman" to wait for Douglas, and mentioned during the same conversation that Douglas "always tries to reason with people, but I'll do it."  In context, Jonathan believed she was talking about killing Nathan.

Douglas was tried before a jury on the attempted murder charges in April 2002.  The proceedings ended in a mistrial on May 6, 2002, when the jury failed to reach a unanimous verdict.  Douglas was released from custody, and the case was scheduled to be retried.

Meanwhile, Nathan continued to seek greater custody rights of the children. He took a polygraph test in April 2002 to rebut Chasity's claim that he had abused them, and although he passed, she continued her attempts to limit his visitation.  David J., who was dating Chasity and ultimately married her, noticed that although the family was happy Nathan had passed the polygraph test, appellant's dislike of him did not change.  He also noticed that appellant seemed to have an unusually strong interest in her grandchildren, and that she had a special relationship with R. that she did not share with the others.

Following a contested hearing in the family law case on July 31, 2002, Nathan was awarded joint legal and physical custody of the children and would have them every Thursday through Sunday.  Chasity seemed disappointed and confused by the ruling.

On August 6, 2002, less than a week after Nathan was awarded joint custody

4

United States District Court

For the Northern District of California

1
2
3
4
5
6
7

of the children and three days before the retrial in Douglas's attempted murder case was scheduled to begin, Douglas fatally shot Nathan as Nathan was leaving for work in the morning.  Douglas was driving Charles's car, and the gun he used was the 30.30 Winchester rifle that belonged to Donald Manion.  Manion and appellant had stopped seeing each other by that time, and Manion had discovered that the rifle was missing from his house.  He had a habit of leaving his front door unlocked, and had noticed appellant parked outside his home one evening as he left for a karaoke show at which he regularly performed.  Manion reported the theft of his rifle to the police on August 11, 2002, after he learned about Nathan's murder and decided that the shooting and his missing rifle were "too much of a coincidence."  He provided the police with a shell casing and spent bullet he recovered from a deer he had shot so they could match the murder weapon to his rifle.

8
9
10
11
12
13

About three weeks after the murder, Chasity and David J. abruptly moved to Missouri after David called in sick at his job and sold his car for $500. Appellant came to Missouri with Chasity's children a few weeks later, and the family lived in several different houses over the next few months.  Douglas stayed at appellant's house at Hawkins Bar, and, about a year later, moved with Charles to rejoin the family.  The family moved to Tennessee, where Charles was arrested and gave a statement in which he admitted that Douglas had committed the murder and that Charles had helped him dispose of the murder weapon near a power plant.  The murder weapon was eventually located based on the information that Charles provided.

14
15
16
17

Defense Evidence
Appellant testified on her own behalf.  She denied that she had ever spoken to Trina about Nathan.  Although she had been "unsure" about Nathan's character when Chasity accused him of molesting the children, her feelings about that changed for the better when he passed the polygraph examination, and she "felt fine" with his obtaining joint custody.  Appellant claimed she had no involvement in the divorce or custody proceedings other than driving Chasity to and from the hearings and providing babysitting services.

18
19
20
21

Appellant denied that she had anything to do with Douglas's decision to kill Nathan.  Her relationship with Douglas had soured, and he moved out of the Hawkins Bar house. Douglas was jealous and "stalked" her.  When the attempted murder was committed, Douglas was living with his mother in McKinleyville and appellant had not seen him for several weeks, although they spoke "a lot."

22
23
24
25
26
27

Appellant testified that she did not make any statements to Lisa White about wanting Nathan dead.  She did not like Lisa and did not want her involved with Charles, because Lisa was an older woman who was dirty and had no teeth.  Nor did she ask Donald Manion to kill Nathan while they were dating. Appellant was not very interested in maintaining a relationship with Manion. She never spent the night with him or shot one of his guns, although he did show her the 30.30 rifle.  Charles had been to Manion's house, but appellant never told him about the rifle or Manion's habit of keeping his house unlocked. Two days after Nathan's murder, Manion telephoned her and mentioned that his rifle was missing, but he thought the former boyfriend of his new girlfriend had taken it.

28

Asked about her move to Missouri/Tennessee after the murder, appellant explained that she just wanted a fresh start.  The family moved frequently

United States District Court

For the Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

once there because of issues with the landlords. When Douglas arrived in Missouri, he told her he was no longer a suspect in Nathan's murder, and she allowed him to live with her because she needed his income.

Chasity testified as a defense witness and denied that her mother was overly involved with R. and M., or that she had interfered in the family law case. After Nathan passed the polygraph, Chasity did not mind his having the children. According to Chasity, appellant was devastated to learn Nathan had been killed. Chasity moved with her family to Missouri because she thought it would be better financially.

*Lunsford*, 2008 WL 1891421, at *1-5.

## STANDARD OF REVIEW

A district court may not grant a petition challenging a state conviction or sentence on the basis of a claim that was reviewed on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). The first prong applies both to questions of law and to mixed questions of law and fact, *see Williams (Terry) v. Taylor*, 529 U.S. 362, 407-09 (2000), while the second prong applies to decisions based on factual determinations, *see Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003).

A state court decision is "contrary to" Supreme Court authority, that is, falls under the first clause of § 2254(d)(1), only if "the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams (Terry)*, 529 U.S. at 412-13. A state court decision is an "unreasonable application of" Supreme Court authority, falling under the second clause of § 2254(d)(1), if it correctly identifies the governing legal principle from the Supreme Court's decisions but "unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413. The federal court on habeas review may not issue the writ "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly

6

1   established federal law erroneously or incorrectly." *Id.* at 411.  Rather, the application must

2   be "objectively unreasonable" to support granting the writ.  *Id.* at 409.

3          Under 28 U.S.C. § 2254(d)(2), a state court decision "based on a factual

4   determination will not be overturned on factual grounds unless objectively unreasonable in

5   light of the evidence presented in the state-court proceeding." *See Miller-El*, 537 U.S. at

6   340; *see also Torres v. Prunty*, 223 F.3d 1103, 1107 (9th Cir. 2000).

7          When there is no reasoned opinion from the highest state court to consider the

8   petitioner's claims, the court looks to the last reasoned opinion.  *See Ylst v. Nunnemaker*,

9   501 U.S. 797, 801-06 (1991).  Thus, a federal court will "look through" the unexplained

10  orders of the state court's rejection of a petitioner's claims and analyze whether, in the last

11  reasoned opinion, the state court unreasonably applied Supreme Court precedent.  *See*

12  *Ylst,* 501 U.S. at 804-06.  For claims one through six, the court looks to the opinion of the

13  California Court of Appeal.

14                                        **DISCUSSION**

15         As grounds for federal habeas relief, petitioner asserts that: (1) her due process

16  rights were violated by the trial court's failure to instruct on the required mens rea for an

17  aider and abettor with respect to lying in wait; (2) her due process rights were violated due

18  to the trial court's erroneous instructions on alternative theories of first degree murder; (3)

19  her due process rights were violated by the trial court's failure to correctly instruct on

20  conspiracy and overt acts; (4) her due process rights were violated by the trial court's

21  failure to instruct on withdrawal from the conspiracy and withdrawal from aiding and

22  abetting; (5) there were several instances of prosecutorial misconduct during cross

23  examination and closing arguments; (6) counsel was ineffective for failing to object to the

24  misconduct; (7) evidence regarding the prior attempted murder of the victim was

25  erroneously admitted; and (8) the court failed to instruct the jury on lesser included

26

27

28

United States District Court
For the Northern District of California

1   offenses.[3]

2   **I.    Lying-in-Wait Jury Instruction**

3          Petitioner contends that her due process rights were violated by the trial court's

4   failure to instruct the jury on the required mens rea for an aider and abettor with respect to

5   the theory of first degree murder by lying in wait and the lying-in-wait special circumstance

6   instruction.  She argues that there was no showing that she intended for the co-defendant

7   to kill the victim by lying in wait or that she personally knew that he would do so.

8          **Legal Standard**

9          A challenge to a jury instruction solely as an error under state law does not state a

10  claim cognizable in federal habeas corpus proceedings.  *See Estelle v. McGuire*, 502 U.S.

11  62, 71-72 (1991); *see, e.g., Stanton v. Benzler*, 146 F.3d 726, 728 (9th Cir. 1998) (state law

12  determination that arsenic trioxide is a poison as a matter of law, not element of crime for

13  jury determination, not open to challenge on federal habeas review).  Nor does the fact that

14  a jury instruction was inadequate by Ninth Circuit direct appeal standards mean that a

15  petitioner who relies on such an inadequacy will be entitled to habeas corpus relief from a

16  state court conviction.  *See Duckett v. Godinez*, 67 F.3d 734, 744 (9th Cir. 1995) (citing

17  *Estelle*, 502 U.S. at 71-72).

18         To obtain federal collateral relief for errors in the jury charge, a petitioner must show

19  that "'the ailing instruction by itself so infected the entire trial that the resulting conviction

20  violates due process.'"  *Estelle* at 72 (quoting *Cupp v. Naughten*, 414 U.S. 141, 147

21  (1973)); *see also Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974) ("'[I]t must be

22  established not merely that the instruction is undesirable, erroneous or even 'universally

23  condemned,' but that it violated some [constitutional right].'").  The instruction may not be

24  ───────────────

25         [3] Claims seven and eight were not denied on the merits by the state court, as discussed
    in a prior motion to dismiss for procedural default.  Docket No. 24.  If a federal court concludes
26  that an asserted procedural bar was not an independent and adequate ground for the state
    court decision, the federal court must consider the claim on the merits; if the state courts never
27  reached the merits of the claim, the federal court reviews the claim de novo.  *See Pirtle v.
    Morgan*, 313 F.3d 1160, 1167-68 (9th Cir. 2002) (holding that deferential AEDPA standard of
28  review does not apply in this context).  Therefore, claims seven and eight will be reviewed de
    novo.

**United States District Court**
For the Northern District of California

1    judged in artificial isolation, but must be considered in the context of the instructions as a

2    whole and the trial record.  *See Estelle* at 72.  In other words, the court must evaluate jury

3    instructions in the context of the overall charge to the jury as a component of the entire trial

4    process.  *United States v. Frady*, 456 U.S. 152, 169 (1982) (citing *Henderson v. Kibbe*, 431

5    U.S. 145, 154 (1977)); *Prantil v. California*, 843 F.2d 314, 317 (9th Cir. 1988); *see, e.g.,*

6    *Middleton v. McNeil*, 541 U.S. 433, 434-35 (2004) (per curiam) (no reasonable likelihood

7    that jury misled by single contrary instruction on imperfect self-defense defining "imminent

8    peril" where three other instructions correctly stated the law).  Even if constitutional

9    instructional error has occurred, the federal court must still determine whether a petitioner

10   has suffered actual prejudice, that is, whether the error "'had substantial and injurious effect

11   or influence in determining the jury's verdict.'"  *Brecht v. Abrahamson*, 507 U.S. 619, 637

12   (1993) (quoting *Kotteakos v. United States*, 328 U.S. 750, 776 (1946)).

13   **Analysis**

14         **a.**    **Lying in Wait First Degree Murder**

15   This claim was denied in a reasoned opinion by the California Court of Appeal:

> Appellant argues that the instructions on first degree murder under a lying-in-wait theory were defective because they did not require that appellant personally intend that the murder be carried out by such means.  We disagree.  The jury was instructed on the elements of lying in wait murder and on aiding and abetting as defined in CALCRIM No. 401, which provides in relevant part: "To prove that the defendant is guilty of a crime based on aiding and abetting that crime, the People must prove that: [¶] 1. The perpetrator committed the crime; [¶] 2. The defendant knew that the perpetrator intended to commit the crime; [¶] 3. Before or during the commission of the crime, the defendant intended to aid and abet the perpetrator in committing the crime; [¶] AND [¶] 4.  The defendant's words or conduct did in fact aid and abet the perpetrator's commission of the crime. [¶] Someone aids and abets a crime if he or she knows of the perpetrator's unlawful purpose and he or she specifically intends to, and does in fact, aid, facilitate, promote, encourage, or instigate the perpetrator's commission of that crime."  This instruction adequately sets forth the principles of aiding and abetting.  (*See People v. Mendoza* (1998) 18 Cal.4th 1114, 1123; *People v. Beeman* (1984) 35 Cal.3d 547, 560.)  Appellant cites no authority requiring an additional instruction to the effect that she must have personally intended the murder be carried out by means of lying in wait.

> Appellant also claims the instruction on lying-in-wait first degree murder was defective because it failed to advise the jurors that the period of watching and waiting necessary to establish that offense must be "substantial."  Although CALCRIM No. 521 did not use the term "substantial" to define the period of

United States District Court

For the Northern District of California

1
2
3
4
5
6
7

watching and waiting necessary for lying-in-wait murder, it does state, "The lying in wait does not need to continue for any particular period of time, but its duration must show a state of mind equivalent to deliberation and premeditation." This was sufficient to demonstrate the requisite period of watching and waiting. (*See People v. Poindexter* (2006) 144 Cal.App.4th 572, 584–585.) Additionally, CALCRIM No. 728, defining the lying-in-wait special circumstance, advised the jury that the duration of the period of lying in wait "must be substantial and must show a state of mind equivalent to deliberation or premeditation." By finding the special circumstance true, the jury necessarily found that the period of lying in wait was "substantial," rendering harmless the omission of this term in the instruction on the lying-in-wait theory of first degree murder.

*Lunsford*, 2008 WL 1891421, at *10-11.

8
9
10
11
12
13
14
15
16
17
18

To the extent petitioner argues that there was an error under state law, she is not entitled to federal habeas relief. *See Estelle* at 71-72. Nor has she demonstrated that this jury instruction so infected the entire trial that the conviction violated due process. There was sufficient evidence presented at trial that petitioner instigated and directed the killing of the victim and that her husband, who performed the killing, laid in wait. Petitioner despised the victim and wanted him dead; she solicited others to help her kill him; she pressured her husband into killing the victim; the husband waited outside the victim's apartment for several hours in the early morning before shooting and killing him; and the rifle used in the killing belonged to the man with whom petitioner had been romantically involved. Reporter's Transcript ("RT") at 1460-64, 1472-77, 1538, 1719-24, 1881, 1906, 2097-98.

19
20
21
22
23
24
25

Under California law all persons concerned in the commission of a crime, whether they directly commit the act constituting the offense or aid and abet in its commission, are principals in any crime so committed. Cal. Penal Code § 31. A person who aids and abets a crime is guilty of that crime even if someone else committed some or all of the criminal acts. *People v. McCoy*, 25 Cal. 4th 1111, 1117 (2001). State law does not require the added instructions petitioner argues were missing, nor did the lack of these instructions violate due process. This claim is denied.

26
27
28

### b.   Lying-in-Wait Special Circumstance

The California Court of Appeal also found that the jury was properly instructed on the lying-in-wait special circumstance:

1
2
3

The jury found "[t]he defendant intentionally killed the victim by means of lying in wait." (§ 190.2, subd. (a)(15).)  Appellant argues that this finding cannot stand because the lying-in-wait special circumstance applies only to the actual killer.  We reject the claim.

4
5
6
7
8

Section 190.2, subdivision (c) specifically provides, "Every person, not the actual killer, who, with the intent to kill, aids, abets, counsels, commands, induces, solicits, requests, or assists any actor in the commission of murder in the first degree shall be punished by death or imprisonment in the state prison for life without the possibility of parole if one or more of the special circumstances enumerated in subdivision (a) has been found to be true under Section 190.4."  One of the special circumstances enumerated in subdivision (a) is lying in wait under subparagraph (15).  (§ 190.2, subd. (a)(15).)  The Legislature has thus expressly provided this special circumstance may apply to a defendant who was not the actual killer.

9
10
11
12
13
14

In *People v. Bonilla* (2007) 41 Cal. 4th 313, 330-331 (*Bonilla*), the Supreme Court interpreted the predecessor provision of section 190.2, subdivision (c) to mean that the lying-in-wait special circumstance "appl[ied] equally to those who are liable for first degree murder only as an aider and abettor, provided they have the intent to kill."  (*Bonilla*, at p. 332.)  It did not matter that the lying-in-wait special circumstance required that "the defendant" kill the victim.  "This interpretation would render the express inclusion of lying in wait among the special circumstances covered by former subdivision (b) a nullity.  We decline to attach special significance to the choice of words 'the defendant,' as opposed to 'the killer' or 'the murderer,' where to do so would negate in whole or in part another statutory provision."  (*Id.* at p. 331.)

15
16
17
18
19

Under the instructions given, the jury here necessarily found that appellant aided and abetted Nathan's murder, that she acted with the requisite intent to kill, and that the killing was committed by Douglas, the perpetrator, by means of lying in wait.  This finding satisfies the requirements of section 190.2, subdivision (c), as explained in *Bonilla*, by which we are bound.  (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal .2d 450, 455.)  There is no additional requirement that appellant knew or intended that the killing would be accomplished in this manner, so long as she acted with the requisite intent to kill.  We therefore reject the related argument that the jury was not fully instructed on the elements of the lying-in-wait special circumstance.

20
21

*Lunsford*, 2008 WL 1891421, at *13-14 (footnotes omitted).

22
23
24
25
26
27
28

Similarly, petitioner has failed to show a due process violation, specifically that the special circumstance instruction was so flawed that it affected the entire trial.  As noted above and by the state court, California law allows the lying-in-wait special circumstance to be applied to aiders and abetters.  *See Bonilla at 331*.  That petitioner was not personally lying in wait does not affect the verdict.  Any violation of state law is not cognizable in this federal habeas action, and the state court opinion was not an unreasonable application of any Supreme Court authority.  As petitioner has not demonstrated that the jury instruction

United States District Court

For the Northern District of California

11

1   so infected the entire trial that the resulting conviction violated due process, this claim is

2   denied.

3   **II.     Jury Instructions for Alternative Theories of First Degree Murder**

4          Petitioner next argues that the trial court's jury instructions on alternative theories of

5   first degree murder violated due process because the theories were constitutionally

6   erroneous.

7          **Analysis**

8          This claim was denied on appeal:

9          The trial court instructed the jury with a version of CALCRIM 521 that stated,
       "The defendant has been prosecuted for first degree murder under three
10     theories: (1) the murder was willful, deliberate, and premeditated and (2) the
       murder was committed while lying in wait or immediately thereafter, and (3)
       the murder was committed to kill a witness."  The instruction goes on to state
11     that the jury need not agree on the particular theory, and to define the
       elements of premeditated first degree murder and murder by lying in wait.
12     Appellant argues that her murder conviction must be reversed because there
       is no such thing as first degree murder "committed to kill a witness."  (*See*
13     *People v. Iniguez* (2002) 96 Cal.App.4th 75, 79 [defendant cannot be
       convicted of non-existent crime].)
14

15     As the People acknowledge, a murder is not automatically elevated to murder
       in the first degree when a witness is killed.  The instruction was erroneous to
16     the extent it suggested otherwise.  However, the jury unanimously found true
       the special circumstance allegation that appellant had committed the murder
17     by means of lying in wait.  The requirements for the lying in wait special
       circumstance are more stringent than those for lying in wait murder, and in
18     finding the special circumstance allegation true the jury also necessarily found
       that appellant was guilty of first degree murder under the legally proper theory
19     of lying in wait.  (*People v. Moon* (2005) 37 Cal.4th 1, 22.)  This rendered
       harmless the instruction on the legally invalid theory of first degree murder by
20     killing a witness.  (*See People v. Guiton* (1993) 4 Cal.4th 1116, 1130.)
       Having concluded that appellant was necessarily convicted under a
21     lying-in-wait theory, we need not address her other challenges to the
       erroneous theory of murder by killing a witness.
22

*Lunsford*, 2008 WL 1891421, at *10-11.

23

24          The California Court of Appeal found that while it was erroneous to include an

25   instruction regarding first degree murder for the killing of a witness, any error was harmless

26   because the jury found that the murder was committed by lying in wait.  Petitioner has

27   failed to show that the state court decision was an unreasonable application of Supreme

28   Court authority.  As noted in the previous claim, the jury was properly instructed regarding

**United States District Court**
For the Northern District of California

1    lying in wait and there was sufficient evidence to find petitioner guilty.

2         It is well established that a general guilty verdict is constitutionally valid where the

3    prosecution offered alternate theories of guilt and any of the theories was supported by

4    sufficient evidence.  *Griffin v. United States*, 502 U.S. 46, 56-60 (1991); *Turner v. United*

5    *States*, 396 U.S. 398, 420 (1970).  Thus, sufficient evidence of any one of the theories of

6    criminal liability challenged by petitioner will suffice to preclude federal habeas relief.  *See*

7    *Sochor v. Florida*, 504 U.S. 527, 538 (1992) (describing *Griffin* as holding "it was no

8    violation of due process that a trial court instructed a jury on two different legal theories,

9    one supported by the evidence, the other not"); *Potter v. Hornbeck*, 469 Fed. Appx. 645,

10   646-47 (9th Cir. 2012) (conviction must be affirmed if either of two legal theories of murder

11   is supported by the evidence).

12        In the instant case, the jury specifically found that petitioner was guilty of first degree

13   murder through lying in wait.  Clerk's Transcript ("CT") at 484.  Petitioner does not raise a

14   claim challenging the sufficiency of the evidence; rather, she challenges the jury

15   instructions.  There was no error in the lying-in-wait jury instruction and, as described

16   above, there was sufficient evidence to find her guilty of the charged crimes regardless of

17   the erroneous witness murder instruction.  The erroneous instruction did not make the

18   entire trial unfair in light of the correct lying-in-wait instruction and the sufficient evidence

19   that supported it.  Nor is there any merit to petitioner's argument that the jury instruction

20   should have elaborated that there needed to be "substantial" waiting to be guilty of lying in

21   wait.  Regardless, the evidence demonstrated that petitioner's husband waited for the

22   victim outside his house from approximately 1:30 a.m. to 4:30 a.m.  RT at 1719-24.

23   Petitioner has failed to demonstrate that the state court denial of this claim was an

24   unreasonable application of Supreme Court authority, thus this claim is denied.

25   **III.     Conspiracy Jury Instruction**

26        Petitioner argues her due process rights were violated by the trial court's failure to

27   correctly instruct on conspiracy and overt acts.

28

**Analysis**

The California Court of Appeal denied this claim:

Appellant argues that her conviction for conspiracy to commit murder must be reversed because the jury instructions did not identify the overt acts supporting that crime.  We disagree that reversal is required.

"A conviction of conspiracy requires proof that the defendant and another person had the specific intent to agree to conspire to commit an offense, as well as the specific intent to commit the elements of that offense, together with proof of the commission of an overt act 'by one or more of the parties to such agreement' in furtherance of the conspiracy." (*People v. Lee* (2006) 136 Cal. App. 4th 522, 528–529.)  An overt act is an element of the crime of conspiracy "in the sense that the prosecution must prove it to a unanimous jury's satisfaction beyond a reasonable doubt.  But that element consists of an overt act, not a specific overt act." (*People v. Russo* (2001) 25 Cal.4th 1124, 1134.)  Due process requires that the overt acts be pleaded with particularity to give a defendant notice of the nature of the charge. (*People v.. Cook* (2001) 91 Cal. App. 4th 910, 921.)

Here, the second amended information alleged eight overt acts by Douglas, appellant and Charles in support of the conspiracy count against appellant. The trial court gave CALCRIM No. 563 defining conspiracy, which provided, in relevant part, "To prove that the defendant is guilty of this crime, the People must prove that: [¶] 1.  The defendant intended to and did agree with Douglas Lunsford or Charles Lunsford to commit murder; [¶] 2.  At the time of the agreement, the defendant and one or more of the other alleged members of the conspiracy intended that one or more of them would commit murder; [¶] 3. The defendant, or Douglas Lunsford or Charles Lunsford, or all of them committed the overt act alleged to accomplish the murder; [¶] AND [¶] 4.  At least one of these overt acts was committed in California.... [¶][¶]  An overt act is an act by one or more of the members of the conspiracy that is done to help accomplish the agreed upon crime.  The overt act must happen after the defendant has agreed to commit the crime.  The overt act must be more than the act of agreeing or planning to commit the crime, but it does not have to be a criminal act itself."  The instruction did not list any of the specific overt acts that had been alleged in the second amended information on which appellant was tried, and the court did not read the information in the course of the instructions. The prosecutor discussed those overt acts during closing argument.

Appellant argues that the failure to instruct on the particular overt acts amounted to a failure to instruct on each essential element of the offense, and enabled the jury to rely on overt acts that were not pleaded and as to which she had no notice.  She claims the prosecutor's discussion of the overt acts during closing argument did not cure the harm, because the jury was told that argument was not evidence, and some of the acts discussed during that argument were improperly considered because they took place after the target offense of murder was committed. (*See People v. Brown* (1991) 226 Cal.App. 3d 1361, 1368.)

Any error regarding the instructions on overt acts was harmless beyond a reasonable doubt in light of appellant's conviction of the target offense of murder. (*See People v. Hoyos* (2007) 41 Cal. 4th 872, 915.)  The

14

United States District Court

For the Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

commission of the target offense in furtherance of a conspiracy necessarily satisfies the overt act requirement.  (*People v. Jurado* (2006) 38 Cal. 4th 72, 121–122.)   Although the murder itself was not pled as a specific overt act in the second amended information, the charge of murder was sufficient to give appellant the notice necessary for her to prepare her defense on that issue. The court's instructions properly defined an overt act and the other elements of conspiracy, and the jurors necessarily agreed that appellant had committed such an act in furtherance of the conspiracy when they convicted her of the murder count.  (*Hoyos*, supra, 41 Cal. 4th at p. 915; *see also People v.. Prieto* (2003) 30 Cal. 4th 226, 251 [in case where conspiracy was theory of the offense, but not charged as a substantive crime, the court did not err in failing to specify overt acts when proper definition of overt act was given].)

*Lunsford*, 2008 WL 1891421, at *11-12.

Petitioner has again failed to show that the jury instruction by itself so infected the entire trial that the resulting conviction violates due process.  While the jury instruction did not include the eight overt acts that had been charged, the overt acts were discussed in closing arguments and evidence was presented at trial for the overt acts.  Petitioner was found guilty of the underlying offense in addition to the conspiracy charge.  Under state law, any error was harmless because petitioner was found guilty of the murder.  Petitioner has identified no Supreme Court authority holding that the failure to identify the overt acts in the jury instructions would entitle her to habeas relief despite being found guilty of the underlying crime.  Sufficient evidence was presented that petitioner committed an overt act, and she has failed to demonstrate that the state court opinion finding any error harmless was an unreasonable application of Supreme Court authority.

**IV.    Failure to Instruct on Withdrawal from Conspiracy**

Petitioner contends that her due process rights were violated by the trial court's failure to sua sponte instruct on withdrawal from the conspiracy and withdrawal from aiding and abetting.

**Legal Standard**

A criminal defendant "is entitled to an instruction as to any recognized defense for which there exists evidence sufficient for a reasonable jury to find in his favor." *Mathews v. United States*, 485 U.S. 58, 63 (1988).  However, a federal court sitting in habeas review is ordinarily "bound to accept a state court's interpretation of state law." *Butler v. Curry*, 528

**United States District Court**
For the Northern District of California

1

F.3d 624, 642 (9th Cir. 2008) (quotation marks omitted).  Additionally, a state trial court's

finding that the evidence does not support a claimed defense "is entitled to a presumption

of correctness on federal habeas review."  *Menendez v. Terhune*, 422 F.3d 1012, 1029 (9th

Cir. 2005).  As a result, a prisoner bears an "especially heavy" burden to establish a

constitutional violation based on "the failure to give an instruction."  *Clark v. Brown*, 442

F.3d 708, 714 (9th Cir. 2006).

**Analysis**

The California Court of Appeal denied this claim, as follows:

Appellant argues that the trial court should have instructed the jury sua sponte that she was not guilty of conspiracy if she withdrew from the conspiracy before any overt act was committed.  (*People v. Crosby* (1962) 58 Cal.2d 713, 731.)  She relies on evidence that (1) she had severed her relationship with Douglas before the attempted murder on October 3, 2001, and (2) Nathan passed the polygraph test in April 2002, showing he had not molested his children and eliminating appellant's motive to kill him.  We are not persuaded.

A trial court has a sua sponte duty to instruct on a defense to the charged crime """only if it appears that the defendant is relying on such a defense, or if there is substantial evidence supportive of such a defense and the defense is not inconsistent with the defendant's theory of the case."""  (*People v. Russell* (2006) 144 Cal.App.4th 1415, 1424.)  The defense of withdrawal from a conspiracy "requires 'an affirmative and bona fide rejection or repudiation of the conspiracy, communicated to the coconspirators.'"  (*People v. Sconce* (1991) 228 Cal.App.3d 693, 701.)

To withdraw from a conspiracy, the defendant must "make an affirmative repudiation communicated to his [or her] coconspirators."  (*People v. Belmontes* (1988) 45 Cal.3d 744, 793 .)  There was no substantial evidence that appellant affirmatively repudiated a conspiracy to kill Nathan or communicated this intention to Douglas or Charles.  Appellant's defense at trial was not that she had planned the murder and then renounced the plan; her defense was that Douglas acted alone and she never intended to kill Nathan at all.  The court was not required to instruct sua sponte on withdrawal from the conspiracy.

. . .

Appellant argues in a supplemental brief that her murder conviction must be reversed because the trial court failed to give a sua sponte instruction on the effect of an aider and abettor's withdrawal from the crime.  She cites the second portion of CALCRIM No. 401, which was not given in this case, but which would have advised the jury: "A person who aids and abets a crime is not guilty of that crime if he or she withdraws before the crime is committed. To withdraw, a person must do two things: [¶] 1.  He or she must notify everyone else he or she knows is involved in the commission of the crime that he or she is no longer participating.  The notification must be made early

16

United States District Court

For the Northern District of California

enough to prevent the commission of the crime. [¶] AND [¶] 2.  He or she must do everything reasonably within his or her power to prevent the crime from being committed.  He or she does not have to actually prevent the crime. [¶]  The People have the burden of proving beyond a reasonable doubt that the defendant did not withdraw.  If the People have not met this burden, you may not find the defendant guilty under an aiding and abetting theory."

We reject this argument for the same reason we concluded in the preceding section that no substantial evidence supported an instruction on appellant's withdrawal from the conspiracy.  The case for an instruction on withdrawal by an aider and abettor is even weaker, because there is no evidence whatsoever that appellant did "everything reasonably within ... her power to prevent the crime from being committed."

*Lunsford*, 2008 WL 1891421, at *12-13.

Petitioner has not shown that the state court unreasonably applied Supreme Court authority in denying this claim.  The California Court of Appeal analyzed the evidence at trial and found there was no basis for the trial court to sua sponte issue these instructions.  The California Court of Appeal reviewed petitioner's assertions and held that there was no evidence to support her arguments of withdrawal.  The state court's determination that there was insufficient evidence to warrant a sua sponte defense instruction, "should be the final word on the subject."  *Menendez*, 422 F.3d at 1029.

Petitioner does not cite to any federal law with respect to this claim and only refers to state cases.  Regardless, even if she did allege a due process violation, she is not entitled to relief.  *See Langford v. Day*, 110 F.3d 1380, 1389 (9th Cir. 1996) (stating that a petitioner may "not transform a state-law issue into a federal one merely by asserting a violation of due process").  The few pieces of evidence she cites describing her withdrawal are insufficient when viewed against the evidence that petitioner was an active participant in the conspiracy and crime and aided its carrying out.  Petitioner has failed to meet her heavy burden to establish a constitutional violation based on the failure to give an instruction; thus, this claim is denied.

**V.    Prosecutorial Misconduct**

Petitioner asserts that the prosecutor committed misconduct by interfering with her right to call her son Charles as a witness; by stating that another witness, her daughter Chasity, was dishonest; and for arguing that petitioner and Chasity lied when they testified

17

that Charles could not read.

**Legal Standard**

Prosecutorial misconduct is cognizable in federal habeas corpus.  The appropriate standard of review is the narrow one of due process and not the broad exercise of supervisory power.  *Darden v. Wainwright*, 477 U.S. 168, 181 (1986).  A defendant's due process rights are violated when a prosecutor's misconduct renders a trial "fundamentally unfair." *Id.*; *Smith v. Phillips*, 455 U.S. 209, 219 (1982) ("the touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor").  Under *Darden*, the first issue is whether the prosecutor's remarks were improper; if so, the next question is whether such conduct infected the trial with unfairness.  *Tan v. Runnels*, 413 F.3d 1101, 1112 (9th Cir. 2005).  A prosecutorial misconduct claim is decided "'on the merits, examining the entire proceedings to determine whether the prosecutor's remarks so infected the trial with unfairness as to make the resulting conviction a denial of due process.'"  *Johnson v. Sublett*, 63 F.3d 926, 929 (9th Cir.) (citation omitted), *cert. denied*, 516 U.S. 1017 (1995); *see Trillo v. Biter*, 754 F.3d 1085, 1091 (9th Cir. 2014) ("Our aim is not to punish society for the misdeeds of the prosecutor; rather, our goal is to ensure that the petitioner received a fair trial.").

**1.      Compulsory Process**

**Background**

The state court set forth the background for this claim, as follows:

On August 8, 2002, two days after Nathan was murdered, Charles gave a recorded statement to police in which he claimed that he and Douglas had gone fishing on the day of the murder.  A year later, after he and Douglas and appellant had moved to Tennessee, Charles was again interviewed and acknowledged that Douglas had shot and killed Nathan.  Charles stated that "mainly" he and Douglas knew about the shooting, but that appellant had "kind of" and "more or less" known about the shooting and "more or less" wanted it done.  During an August 24, 2003 interview in the Humboldt County jail, after he had been taken into custody, Charles said that appellant had been very upset about the order awarding Nathan 50 percent custody of his children and that she was probably angry enough to kill Nathan that day.  He said appellant was the boss of the house and that after the murder Douglas told her he took a couple of shots at Nathan but did not know whether he had hit him.

The prosecution filed charges of first degree murder and conspiracy to

United States District Court

For the Northern District of California

commit murder against Douglas, appellant and Charles, but the cases were severed.  Douglas was separately tried and convicted of all charges except the witness killing special circumstance in early 2005.  Charles was declared incompetent to stand trial between March 2005 and September 2005.  Appellant's trial was held between November 2005 and February 2006.  In March 2006, after appellant had been convicted, but before she was sentenced, Charles was offered an open plea to voluntary manslaughter with an indicated term of six years.

On March 22, 2006, Charles was interviewed by the probation officer who prepared the pre-plea report in his case.  Charles told the officer that appellant had been very angry with Nathan because she believed he was molesting his children.  Charles had overheard appellant and Douglas discussing plans to kill Nathan, with appellant pressuring Douglas to do so.  Charles commented that no one in the family said "no" to his mother, and that she was threatening to divorce Douglas if he did not kill Nathan.  He believed that even if Douglas had refused, his mother would have found a way to commit the crime.  She "borrowed" a rifle from Donald Manion and gave it to Douglas to use in the murder.  She had also asked Lisa White to kill Nathan.

Appellant's trial counsel sent an investigator to interview Charles on July 19, 2006.  Contrary to what he told the probation officer in his case, Charles stated that he did not know where Douglas had obtained the murder weapon, that Douglas killed Nathan because he has "raped the children," that he had never heard appellant discuss the murder with Douglas and that appellant had appeared shocked when Charles told her that Douglas killed Nathan.  Charles said he had not testified at appellant's trial because his attorney told him that if he did he would probably get life in prison.  His attorney also told him he would get life if he testified at his own trial, and advised him to avoid going to trial.  Charles could have testified that as far as he knew, appellant did not know anything about the killing.

Appellant filed a motion for new trial, arguing that Charles's statement to the defense investigator was newly discovered evidence, and that since Charles had entered a plea and was no longer facing a life sentence, he was willing to testify to facts that would contradict the incriminating testimony given by Lisa White about appellant's statements. The trial court denied the motion, noting that Charles had made other statements to the probation officer in his own case that directly contradicted his proposed testimony and implicated appellant in the crimes.  The court characterized Charles's proposed testimony as "a belated attempt by Charles to assist or protect his mother in these proceedings," and concluded a different result was not reasonably probable if a new jury heard the testimony.

Appellant does not challenge the trial court's ruling on the motion for new trial per se. Instead, she argues that the evidence presented in support of the motion shows that the prosecutor violated appellant's right to compulsory process and due process when it employed intimidating tactics to discourage Charles from testifying.  She claims her trial attorney provided ineffective assistance of counsel when he failed to assert this as a ground for a new trial.

As to the substance of her argument, appellant relies primarily on an e-mail message that was written by the prosecutor to Charles's attorney on December 9, 2005, two days before the prosecution completed its case-in-chief in appellant's trial:

19

United States District Court

For the Northern District of California

1   "Let me know when Charles is ready to be [polygraphed] and I will get it set up.  For the record, it has never been our position that Charles was the shooter.  That doesn't make him innocent.

2   

3   "Here is how it's going to have to be: he can come talk to us, we'll poly him and, if he passes, sit down and talk about what sort of a deal we'll make him. But right now, he knows about the murder of Nathan, he's a co-conspirator, and he is doing absolutely nothing to assist us in bringing Nathan's murderers to justice.  Charles isn't scoring any points.

4   

5   

6   "I've won and I've lost cases, it's all the same to me. So, trying Charles is no skin off my back and, frankly, the strongest case is the one against him.

7   

8   "You're a good attorney and might be able to get him off or a hung jury, but I'm planning on something a little different and, if he goes to trial and is convicted, Charles will have a long time to think about whether he should have come forward."

9   

10  The prosecutor subsequently advised the court and defense counsel that the People were considering calling Charles as a witness against appellant, but that Charles would be taking a polygraph test before a final decision was made. Charles took the polygraph test, which, according to the prosecutor, indicated that some of his statements were not accurate. The prosecution did not call him as a witness.

11  

12  

13  *Lunsford*, 2008 WL 1891421, at *6-7 (footnote omitted).

14  **Analysis**

15  After setting forth the relevant state law regarding prosecutorial misconduct and the

16  right to call a witness, the California Court of Appeal denied this claim.

17  

18  Appellant argues that the prosecutor's e-mail to Charles's defense counsel was a threat that if he testified on appellant's behalf, he would be prosecuted for murder and sentenced to 25 years to life.  But Charles was already being prosecuted for murder, which carried a life sentence, and was being considered as a prosecution witness against appellant based on statements he had previously made to investigators.  The prosecutor's message advised defense counsel that he believed Charles was guilty, but that he would consider a deal if Charles was willing to assist the prosecution by providing them with information about his co-defendants' guilt assuming he passed a polygraph test.  The prosecutor's e-mail message did not threaten retaliation against Charles if he testified in favor of appellant, nor did it promise any benefit to Charles if he refrained from testifying for appellant.  To the contrary, it does not appear the prosecutor had any reason to believe Charles could truthfully testify favorably for appellant, given his statements to police investigators in 2002 and 2003.

19  

20  

21  

22  

23  

24  

25  This is not a case like *Woods*, *supra*, 146 Cal. App. 4th at pp. 119–120, on which appellant relies.  In *Woods*, the prosecutor conditioned a cohort's plea bargain on an agreement that he would not testify at the defendant's trial, and threatened to have that plea bargain set aside if such testimony was given. There was no similar coercion in this case.  Although the prosecutor was obviously interested in securing Charles's cooperation, it is not misconduct to

26  

27  

28

United States District Court

For the Northern District of California

1

2

advise a less culpable witness that a favorable plea agreement will be considered in exchange for truthful testimony against a cohort. (*See People v. Gurule* (2002) 28 Cal. 4th 557, 615 [immunity agreement requiring that witness testify truthfully is valid and not impermissibly coercive].)

3

4

5

6

7

8

9

Even if the prosecutor's e-mail message could be construed to contain a veiled threat that Charles would not receive a good plea bargain if he testified in appellant's favor, appellant cannot demonstrate prejudice. Because this issue was not raised below, we apply the standard of harmless error applicable to claims of ineffective assistance of counsel, which requires the defendant to demonstrate a "reasonable probability" that, but for counsel's omission, the defendant would have obtained a better result. (*People v. Mesa* (2006) 144 Cal. App. 4th 1000, 1008–1009.) There is no reasonable probability that a jury hearing Charles's proposed testimony would credit his claim that appellant knew nothing of the plan to murder Nathan when his previous statement to the probation officer in his own case was in direct conflict on many points and provided a number of details about appellant's involvement in the crime.

10

*Lunsford*, 2008 WL 1891421, at *8-9.

11

12

13

14

15

16

17

18

19

20

21

The Compulsory Process Clause of the Sixth Amendment preserves the right of a defendant in a criminal trial to have compulsory process for obtaining a favorable witness. *Washington v. Texas*, 388 U.S. 14, 19 (1967); *see also Webb v. Texas*, 409 U.S. 95, 97-98 (1972). A defendant's right to compulsory process is violated by a prosecutor when coercive language or tactics are employed that substantially interfere with a defense witness' decision whether or not to testify. *United States v. Vavages,* 151 F.3d 1185, 1189 (9th Cir. 1998). There is no constitutional violation when the prosecutor is neither coercive nor intimidating and does not interfere with the witness' decision regarding testifying. *See e.g., United States v. Jaeger*, 538 F.3d 1227, 1232 (9th Cir. 2008) (court did not interfere with witness by using brief, factual, and mildly worded statements regarding possible detrimental consequences to her testimony).

22

23

24

25

26

27

28

The California Court of Appeal found that the prosecutor's e-mail was not misconduct or a threat, and petitioner has not shown that this was an unreasonable determination. A review of the e-mail does not indicate any coercion or interference with the witness' decision to testify. Nor has petitioner shown that the trial was rendered fundamentally unfair by Charles' failure to testify. Assuming Charles' trial testimony would have been similar to what he had told the defense investigator, he would have been

1   impeached by his previous statements to the probation officer that implicated petitioner.  He

2   could have also been questioned about whether his testimony had been tailored to protect

3   petitioner, who is his mother.  Based on the lack of coercion and minimal importance of the

4   testimony, petitioner has not shown that the California Court of Appeal's decision was an

5   unreasonable application of Supreme Court authority, and this claim is denied.

6     **2.**  **Witness Testimony**

7     Petitioner next argues that the prosecutor committed misconduct by stating that

8   another witness, her daughter Chasity, was dishonest, and for arguing that petitioner and

9   Chasity lied when they testified that Charles could not read.  The state court denied this

10   claim.

> During closing argument, the prosecutor urged the jury to find that Chasity
> was not a credible witness because she had taken contradictory positions
> about her son R.'s paternity.  This argument was based on Chasity's
> acknowledgement during cross-examination that she had identified Nathan as
> R.'s father when she was attempting to collect social security benefits after
> Nathan's death, even though she had sought a declaration in family court that
> R.'s biological father, James B., was his legal father.  Appellant argues that
> this line of questioning and argument was improper because Nathan was R.'s
> presumed father as that status is defined under California law (Fam.Code, §
> 7611, subd. (a)); thus, Chasity was not dishonest when she identified Nathan
> as R.'s father for one purpose but not another.

> . . . . The prosecutor was entitled to explore the issue of Chasity's credibility
> on cross-examination.  Her decision to claim that Nathan was R.'s father
> when it was beneficial to do so, but to dispute paternity when that would give
> her an advantage in a custody dispute, was fair game and was not legally
> inaccurate.  The prosecutor's point was not that Nathan was or was not R.'s
> legal father, it was that Chasity took whatever position on that issue was
> expedient at the moment.

> Appellant also complains that the prosecutor committed misconduct by
> arguing that Chasity and appellant were not credible because they testified
> that Charles could not read when, in fact, he had passed a California driver's
> license examination that required him to read.  Appellant notes that the
> California Driver's Handbook only requires that licensed drivers be able to
> read traffic signs in English, and makes audio examinations available for
> applicants.  Assuming the prosecutor misrepresented the literacy requirement
> for a California driver's license, the point was a minor one in a trial that lasted
> over two months and in which evidence of much greater strength was
> presented against appellant.

*Lunsford*, 2008 WL 1891421, at *9.

  A prosecutor is permitted to argue reasonable inferences from the evidence.

United States District Court

For the Northern District of California

United States District Court
For the Northern District of California

1   *Duckett v. Godinez*, 67 F.3d 734, 742 (9th Cir. 1995).  "Counsel are given latitude in the

2   presentation of their closing arguments, and courts must allow the prosecution to strike

3   hard blows based on the evidence presented and all reasonable inferences therefrom."

4   *Ceja v. Stewart*, 97 F.3d 1246, 1253-54 (9th Cir. 1996); *see also United States v. Birges*,

5   723 F.2d 666, 672 (9th Cir. 1984) (noting that prosecutor's characterization of defense

6   theory as a "fabrication" fell "well within the bounds of acceptable comment").  Seeing as

7   Chasity stated that the victim was not the child's father in paternity proceedings but then

8   stated he was the father with respect to collecting social security death benefits, it was

9   reasonable for the prosecutor to question Chasity's credibility as a witness.  Even if this

10  was misconduct, it was not so egregious as to violate due process.  The state court denial

11  of this claim was not an unreasonable application of Supreme Court authority.

12          Petitioner also argues that the prosecutor committed misconduct by stating that the

13  witness Charles could read because he had passed a driver's license exam which rebutted

14  testimony from petitioner and Chasity that Charles could not read.  Petitioner argues that

15  after trial the prosecutor conceded that the Department of Motor Vehicles allows people

16  with limited reading ability to take an oral exam to obtain a driver's license.  Assuming that

17  the prosecutor committed misconduct, this was a minor matter that did not so infect the trial

18  with unfairness as to make the resulting conviction a denial of due process.  The denial

19  claim was not unreasonable, and the claim is denied.

20  **VI.    Ineffective Assistance of Counsel**

21          Petitioner claims that trial counsel was ineffective for failing to object to the purported

22  prosecutorial misconduct described above.

23          **Legal Standard**

24          In order to succeed on an ineffective assistance of counsel claim, a petitioner must

25  satisfy the two-pronged test set forth in *Strickland v. Washington*, 466 U.S. 668, 687

26  (1984), which requires a showing of deficient performance and prejudice.  Deficient

27  performance requires a showing that trial counsel's representation fell below an objective

28  standard of reasonableness as measured by prevailing professional norms.  *See Wiggins*

United States District Court

For the Northern District of California

1    *v. Smith*, 539 U.S. 510, 521 (2003).  To establish prejudice, a petitioner must show a

2    reasonable probability that "but for counsel's unprofessional errors, the result of the

3    proceeding would have been different."  *See Strickland*, 466 U.S. at 694.

4    **Analysis**

5    The court has already determined that the prosecutor did not commit misconduct

6    and any alleged misconduct did not rise to the level of a constitutional violation.  The

7    California Court of Appeal also held that trial counsel was not ineffective for failing to object

8    to the alleged misconduct.  *Lunsford*, 2008 WL 1891421, at *9.  Petitioner has not shown

9    that the state court denial was an unreasonable application of *Strickland*.  Even assuming

10   that there was misconduct and counsel was ineffective for failing to object, there was no

11   prejudice.  Charles had already provided conflicting statements about petitioner's

12   involvement, so any testimony he provided would have been impeached.  Nor was there

13   any prejudice from failing to object to the prosecutor's statements regarding Chasity's

14   credibility because any objection would have been overruled and Charles' ability to read

15   was a minor issue in a large trial with many witnesses and much evidence.

16   **VII.   Admission of Evidence**[4]

17   Petitioner argues that the evidence regarding the prior attempted murder of the

18   victim was erroneously admitted.

19   **Legal Standard**

20   The admission of evidence is not subject to federal habeas review unless a specific

21   constitutional guarantee is violated or the error is of such magnitude that the result is a

22   denial of the fundamentally fair trial guaranteed by due process.  *See Henry v. Kernan*, 197

23   F.3d 1021, 1031 (9th Cir. 1999); *Colley v. Sumner*, 784 F.2d 984, 990 (9th Cir. 1986).  The

24   Supreme Court "has not yet made a clear ruling that admission of irrelevant or overtly

---

26   [4] Claims seven and eight will be reviewed de novo.  *See Pirtle v. Morgan*, 313 F.3d
1160, 1167-68 (9th Cir. 2002).  These claims were presented to the state court in a habeas

27   petition and while claim seven was difficult to understand the court allowed the claim to
proceed as construed herein.  *See Roy v. Lampert*, 465 F.3d 964, 970 (9th Cir. 2006) ("We

28   must construe *pro se* habeas filings liberally") (citation and internal quotation marks omitted);
Docket No. 24 at 6-7.

United States District Court

For the Northern District of California

1    prejudicial evidence constitutes a due process violation sufficient to warrant issuance of the

2    writ." *Holley v. Yarborough*, 568 F.3d 1091, 1101 (9th Cir. 2009) (finding that trial court's

3    admission of irrelevant pornographic materials was "fundamentally unfair" under Ninth

4    Circuit precedent but not contrary to, or an unreasonable application of, clearly established

5    Federal law under § 2254(d)).

6    **Analysis**

7        Petitioner argues that despite the special circumstance witness killing finding being

8    vacated on appeal, the admission of evidence regarding the prior attempted murder of the

9    victim by her husband was a violation of her due process rights.[5]  She alleges she had no

10   involvement with the attempted murder but the admission of evidence regarding the crime

11   unduly prejudiced her.  In allowing this claim to proceed the court previously noted that

12   while the admission of evidence is not generally subject to federal habeas review, petitioner

13   had sufficiently presented a claim that the admission of this evidence was an error of such

14   magnitude that it resulted in a fundamentally unfair trial in violation of due process.  The

15   court ordered respondent to file an answer and provide further information regarding this

16   claim.

17       At petitioner's trial, the testimony from the deceased victim from the prior attempted

18   murder trial was read into the record.  RT at 1376-90.  However, respondent notes, and a

19   review of the record confirms, that petitioner's trial counsel entered into a stipulation to

20   allow the admission of the victim's testimony.  RT at 1317-18, 1376, 1390.  As there was a

21   stipulation and the trial court did not make a ruling, petitioner cannot show that the trial

22   court erred.

23       "The test regarding the validity of a stipulation is voluntariness."  *United States v.*

24   *Zepeda*, 738 F.3d 201, 207 (9th Cir. 2013) (quoting *United States v. Molina*, 596 F.3d 1166,

25

26   _____

27       [5] As noted above, a prior trial of the husband for the attempted murder of the victim
     resulted in a mistrial when the jury failed to reach a unanimous verdict.  There is no indication
     that petitioner was prosecuted in the attempted murder case.  Several months after the
28   mistrial, the husband shot and killed the victim which served as the underlying crime for this
     case.  The murder occurred three days before the attempted murder retrial was set to begin.

United States District Court

For the Northern District of California

1168-69 (9th Cir. 2010)).  Stipulations "freely and voluntarily entered into in criminal trials are as binding and enforceable as those entered into in civil actions."  *Molina*, 596 F.3d at 1169 (citation omitted).  "A defendant who has stipulated to the admission of evidence cannot later complain about its admissibility unless he can show that the stipulation was involuntary." *Zepeda*, 738 F.3d at 207 (citation and internal quotation marks omitted).  Petitioner presents no arguments that the stipulation was involuntary, nor does a review of the record indicate any support for such an argument.  Petitioner was present in court (RT at 1317) when trial counsel entered into the stipulation, and by entering into the stipulation petitioner allowed the jury to only hear part of the victim's testimony from the prior trial.  This claim is denied.

To the extent petitioner argues that trial counsel was ineffective and such a claim was exhausted, petitioner cannot show deficient performance or prejudice.  Even if trial counsel had objected, there is little indication that the trial court would have precluded the evidence from being admitted.  It is highly probable that the trial court would have allowed the evidence to be admitted because the victim was petitioner's son-in-law, and her husband, who performed the actual killing, was the defendant in the retrial that was set to begin for the prior attempted murder.  There was also evidence presented that petitioner orchestrated the murder and, because the victim was also a witness in the prior attempted murder trial, this evidence demonstrated motive and was clearly relevant.  Nor is it likely that the trial court would have excluded the evidence as unduly prejudicial pursuant to Cal. Evid. Code § 352 because it was not alleged to the jury that petitioner was involved in the prior crime.  Thus, petitioner is unable to demonstrate that the result of the proceeding would have been different had trial counsel not entered the stipulation.  For all these reasons, this claim is denied.

**VIII.   Lesser Included Offenses**

Petitioner argues that the trial court erred by failing to instruct on lesser included offenses.

**United States District Court**
For the Northern District of California

1

**Legal Standard**

2

The failure of a state trial court to instruct on lesser-included offenses in a

3 non-capital case does not present a federal constitutional claim.  *See Solis v. Garcia*, 219

4 F.3d 922, 929 (9th Cir. 2000); *Turner v. Marshall*, 63 F.3d 807, 819 (9th Cir. 1995) (citing

5 *Bashor v. Riley*, 730 F.2d 1228, 1240 (9th Cir. 1984)).  However, "the defendant's right to

6 adequate jury instructions on his or her theory of the case might, in some cases, constitute

7 an exception to the general rule."  *Solis*, 219 F.3d at 929 (citing *Bashor v. Risley*, 730 F.2d

8 at 1240).

9

**Analysis**

10

Petitioner argues that the trial court erred by failing to instruct on lesser-included

11 offenses such as second degree murder and manslaughter.  In addition to this failing to

12 state a federal constitutional claim, a review of the record shows that petitioner is not

13 entitled to relief.  Contrary to her assertions, the jury was instructed on second degree

14 murder.  CT at 449; RT at 3059-61.  Moreover, petitioner also specifically requested that

15 the court not instruct on manslaughter or other similar lesser-included offenses.

16

17
THE COURT:          . . . . I believe the defense would not be requesting that
                    the Court instruct on manslaughter, attempt or any other
                    lesser charges.

18

19

20

21

22
TRIAL COUNSEL:  Yes.  After discussing the matter at length with
                    [petitioner] and indicated to her what the possible
                    benefits and/or downside to that decision, it is her
                    decision and mine, to which I concur with her, that we
                    would not be asking the Court to provide the jury or to
                    instruct them on any lessers.  We are well aware the
                    Court is, I believe, duty-bound to instruct on second-
                    degree murder; but that's as far as we would ask the
                    Court to proceed.  And that's after discussing with
                    [petitioner] here today and at an earlier date.

23

24
RT at 3018-19.  Petitioner was present when trial counsel made these statements to the

25
court.  RT at 3017.  Because the trial court instructed the jury on second degree murder

26
and because petitioner specifically requested the court not to instruct on lesser-included

offenses, her claim that the trial court erred is denied.

27

28

United States District Court

For the Northern District of California

1   **IX.   Appealability**

2      The federal rules governing habeas cases brought by state prisoners require a

3   district court that denies a habeas petition to grant or deny a certificate of appealability

4   ("COA") in the ruling.  *See* Rule 11(a), Rules Governing § 2254 Cases, 28 U.S.C. foll.   §

5   2254 (effective December 1, 2009).

6      To obtain a COA, petitioner must make "a substantial showing of the denial of a

7   constitutional right." 28 U.S.C. § 2253(c)(2).  "Where a district court has rejected the

8   constitutional claims on the merits, the showing required to satisfy § 2253(c) is

9   straightforward:  The petitioner must demonstrate that reasonable jurists would find the

10  district court's assessment of the constitutional claims debatable or wrong."  *See Slack v.*

11  *McDaniel*, 529 U.S. 473, 484 (2000).  Section 2253(c)(3) requires a court granting a COA

12  to indicate which issues satisfy the COA standard.  Here, the court finds that petitioner's

13  first three claims regarding the jury instructions and the prosecutorial misconduct claim

14  meet the above standard and accordingly GRANTS the COA solely for those claims.  *See*

15  *generally Miller-El*, 537 U.S. at 327.

16     Accordingly, the clerk shall forward the file, including a copy of this order, to the

17  Court of Appeals.  *See* Fed. R. App. P. 22(b); *United States v. Asrar*, 116 F.3d 1268, 1270

18  (9th Cir. 1997).  Petitioner is cautioned that the court's ruling on the certificate of

19  appealability does not relieve her of the obligation to file a timely notice of appeal if she

20  wishes to appeal.

21                                   **CONCLUSION**

22     For the foregoing reasons, the petition for a writ of habeas corpus is **DENIED**.

23     A Certificate of Appealability is **GRANTED**.  *See* Rule11(a) of the Rules Governing

24  Section 2254 Cases.

25     The clerk shall close the file.

26

27

28

**IT IS SO ORDERED.**

Dated: August 26, 2014.

_____
PHYLLIS J. HAMILTON
United States District Judge

G:\PRO-SE\PJH\HC.08\Lunsford5038.hc.wpd